UNITED STATES of America, Appellee,

v.

Priscilla R. SCOTT, Appellant,

UNITED STATES of America, Appellee,

v.

Stephen Rodger WILSON, Appellant.

Nos. 83–5051(L), 83–5052.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1983.
Decided March 13, 1984.

William R. Metzner, Wheeling, W. Va., for appellant Scott.

John L. Henning, Elkins, W. Va., on brief, for appellant Wilson.

Thomas O. Mucklow, Asst. U.S. Atty., Philippi, W. Va., Richard M. Yurko, Jr., Third Year Law Student (William A. Kolibash, U.S. Atty., Betsy C. Steinfeld, Asst. U.S. Atty., Wheeling, W. Va., on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and BRYAN, Senior Circuit Judge.

ALBERT V. BRYAN, Senior Circuit Judge:

Priscilla R. Scott and Stephen Rodger Wilson were convicted by a jury in the Federal Court for the Northern District of West Virginia on four counts of mail fraud punishable under 18 U.S.C. § 1341.[1] Appealing, they protest that the evidence was not sufficient to justify the verdict on two of the four counts. Furthermore, appellant Scott for herself contends, first, that the trial judge failed to charge the jury correctly with regard to specific intent to defraud, and also that it was error to admit certain statements made by appellant Wilson and used against her under the coconspirator exception to the hearsay rule. Upon consideration, we affirm the convictions on three of the four counts and reverse as to the other.

## I

On September 27, 1982, the appellants were indicted on five counts under the mail fraud statute just quoted. The indictment accused Scott and Wilson of structuring a scheme to defraud the Stonewall Casualty Company, Scott's automobile insurance carrier, by selling Scott's car and thereafter falsely reporting it as stolen with intent to

1. § 1341. Frauds and swindles
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempt-

ing so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

collect some $12,600 under Scott's insurance policy. Particularly, the indictment alleged that Scott and Wilson used the United States Postal Service five times to accomplish their plan.

Testimony put on by the Government traced the scheme to defraud through these steps: Wilson, with Scott's collaboration, arranged through an acquaintance, one Joseph Vernon, to sell Scott's 1980 Cadillac. The sale took place on December 9, 1980. On the December 15 following, Scott obtained an insurance policy covering the previously sold automobile. The insurer was the Stonewall Casualty Company acting through the Thomas Brothers Insurance Agency of Bruceton Mills, West Virginia. Thereupon on December 30, 1980, Scott notified the police that her car had been stolen from the parking lot of a mall in Morgantown, West Virginia. After informing a claims agent from Stonewall of the theft, the insurance company paid Scott $12,600 under her policy.

Government testimony further vouched, and the indictment pleaded, that mail fraud was committed in Scott's purchase of the insurance for the purpose of collecting on a false claim. *Count One* of the indictment embodied Scott's mailing of the insurance premium to her insurance agent (Thomas Brothers) for forwarding to Stonewall with the intention of procuring an insurance policy in return; *Count Two* recited Stonewall's mailing of the insurance policy to Thomas Brothers for delivery to Scott; *Count Three* embraced the actual mailing by Thomas Brothers of the policy to Scott; *Count Four* covered the mailing of the claim check of $12,600 from Stonewall to Scott; and *Count Five* set forth the mailing by Scott of the original automobile theft report and proof of loss to the insurance company.

In defense at trial, Scott gave evidence in which she did not deny her purchase of an insurance policy from Stonewall on December 15, 1980. However, she maintained that there had been a legitimate reason for this transaction. Her previous policy, containing identical terms to the one purchased on December 15, had covered the period from October 29, 1980 to January 29, 1981. But, she insisted this policy was cancelled effective December 10, 1980 because her check of $236.00 for the premium payment had been dishonored by her bank. To sustain the policy, Scott had to pay the insurance company this $236.00 balance which she did on December 15, 1980. Therefore, Scott argued that what appeared to be the purchase of insurance for fraudulent purposes was nothing more than the reinstatement of her original policy.

As for appellant Wilson, Scott testified that she had met him several months prior to December, 1980, and that they had become romantically involved. She had often allowed him to use the Cadillac as well as another car she owned. She recalls that late in the evening of December 9, 1980, she received a telephone call from Wilson saying that he had sold her Cadillac because he needed the money. Then, he had told her to report the car as stolen so as to collect the insurance proceeds. Scott said she became "furious" with Wilson and demanded that he have her car returned. Scott also testified to telling him that her insurance on the car had just lapsed, although technically it would not lapse until the next day. It was, she testified, her hope that the car would be returned that deterred her from at once reporting the car as stolen.

While there was testimony that Wilson endeavored to retrieve Scott's car, he was unsuccessful in this pursuit. However, to keep Wilson out of trouble, Scott gave evidence that she afterward reported her car as having been stolen from the mall parking lot in Morgantown. Scott admitted that her assignment of the December 30, 1980 date for the larceny was false, but she also testified that Wilson himself had, in truth, stolen her car on December 9. Since her old policy was then still in effect, and inasmuch as that policy contained identical terms with the one purchased on December 15, Scott did not feel she was defrauding the insurer. Moreover, in further denying

an intent to defraud, she also stated upon oath that she had asked the insurance company to replace the "stolen" automobile with an identical model rather than give her the proceeds from the insurance policy. While Stonewall was not able to do this and subsequently paid her in cash for the loss, she later repurchased her original car from the company, an act which she argued was further proof of her lack of intent to defraud.[2]

This testimony of Scott notwithstanding, the testimony more damaging against her came from Joseph Vernon, the individual who had in fact sold Scott's car. He claimed that he had met Wilson in late November or early December. At that time, Wilson told him that he had a "lady friend" who wanted to sell her automobile to collect on the insurance. Vernon also testified that, while he was negotiating a price with the buyer, Wilson had called the woman who owned the car from his home to agree on a price for it. Vernon heard Wilson refer to the woman as "Pat", a nickname of Scott. Scott sought to rebut this testimony by stating that Wilson had no phone in his house, but Wilson did not take the witness stand to confirm her story. The jury then convicted appellant on 4 out of the 5 mail fraud counts on December 15, 1982.[3]

## II

Appellants' initial contention is that there was not enough evidence for the jury to convict them on Counts One and Three of the indictment.[4] They press that the prosecution did not adduce evidence on either count which, independently, would establish beyond a reasonable doubt the requisite proof of mailing necessary to sustain a mail fraud conviction. See *United States*

*v. Murr*, 681 F.2d 246, 248 (4th Cir.), *cert. denied*, 459 U.S. 973, 103 S.Ct. 307, 74 L.Ed.2d 286 (1982) (proof of mailing and existence of a scheme to defraud must be presented in order to convict under 18 U.S.C. § 1341). While there is merit in appellants' claim as to Count One, clearly their argument against conviction on Count Three must fail.

■ The standard by which the court must measure the sufficiency of the evidence is laid out in *United States v. Sherman*, 421 F.2d 198 (4th Cir.), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). There, we made clear that:

> The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt. *Glasser v. United States*, 315 U.S. 60, 80 [62 S.Ct. 457, 469, 86 L.Ed. 680] (1942). Where the evidence construed most favorably for the government is such that the jury might find the defendant guilty beyond a reasonable doubt, then the evidence is sufficient to sustain a finding of guilt.

*Id.* at 199–200 (other citations omitted). See also, *United States v. Baker*, 611 F.2d 961, 962 n. 2 (4th Cir.1979). Furthermore, evidence of mailing sufficient to sustain a conviction for mail fraud may be either direct or circumstantial. *United States v. Hopkins*, 357 F.2d 14, 17 (6th Cir.), *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966); *United States v. Wolfson*, 322 F.Supp. 798, 812 (D.Del.1971), *aff'd*, 454 F.2d 60 (3d Cir.), *cert. denied*, 406 U.S. 924, 92 S.Ct. 1792, 32 L.Ed.2d 124 (1972). Introduction of a firm's "office practice" and its "usual course of business", while circumstantial, has been found sufficient to carry the question of mailing

---

**2.** Scott's car, which had actually been sold to undercover members of the Pennsylvania State Police, was later returned to the Stonewall Casualty Company. Stonewall had become the owner of the vehicle after paying Scott the $12,600 under the policy.

**3.** Count Five and a portion of Count One were not submitted to the jury, as the Government agreed that the evidence was inadequate to support convictions on those sections of the indictment.

**4.** Count One involves Scott's mailing of her premium payment to the Thomas Brothers Insurance Agency for forwarding to Stonewall. Count Three encompasses Thomas Brothers' mailing of Scott's policy to her residence.

to the jury. *United States v. Decker*, 51 F.Supp. 15, 18 (D.Md.1943), *aff'd*, 140 F.2d 378 (4th Cir.), *cert. denied*, 321 U.S. 792, 64 S.Ct. 791, 88 L.Ed. 1082 (1944). See also, *United States v. Ledesma*, 632 F.2d 670, 675 (7th Cir.), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980).

■ Returning to the sufficiency of evidence question as to Count One, the Government failed to present proof of mailing which would allow a jury to conclude beyond a reasonable doubt that appellants committed mail fraud. Indeed, appellant Scott testified that she *hand-delivered* her $236.00 premium payment to the Thomas Brothers Agency for transmittal to Stonewall. The Government offers testimony inadequate to overcome this factual testimony. A Thomas Brothers' employee apparently telephoned Scott after her initial premium payment was dishonored and, although she was unavailable at the time of the call, one of Scott's employees represented that the premium *would be* mailed that night. However, considering that Scott did not take this message and that there was no evidence to suggest that the person answering the call was authorized to make representations on Scott's behalf, this amounts to little more than another person's guess as to Scott's future course of action. Standing alone, this certainly is not sufficient evidence under the *Sherman* standard to convict a defendant of mail fraud.

Nevertheless, appellants could still be convicted under Count One of the indictment even if Scott hand-carried the payment to Thomas Brothers. If the latter mailed the payment to Stonewall, that would be enough to convict appellants under 18 U.S.C. § 1341. *Supra*, note 1. However, the Government introduced no proof concerning Thomas Brothers' procedure of transmitting payments to the insurance company. While it is likely that Scott's payment was mailed to Stonewall, considering that its office was at least 25 miles from the Thomas Brothers Agency, probability is not enough to convict a party of mail fraud. *United States v. Ellicott,*

336 F.2d 868, 871 (4th Cir.1964). Hence, appellants' convictions under Count One must be set aside for insufficiency of proof.

■ Concerning appellants' questioning of the proof regarding Count Three of the indictment, *i.e.*, that Thomas Brothers mailed Scott her new insurance policy, appellants' argument has no merit. There is direct testimony in the record that Thomas Brothers, as a matter of course, mailed policies to their clients and made notations thereof in its office files. As already mentioned, proof of mailing established through office practice, while circumstantial, is enough to uphold convictions for mail fraud. Appellants' convictions under Count Three must stand.

### III

Scott also contends that the trial judge committed reversible error when he refused to grant her proposed instruction No. 9. It would have advised the jury that, in determining whether or not a defendant acted with specific intent to defraud, it could consider, with other facts and circumstances disclosed by the evidence, "any later, contemporaneous, or earlier acts and declarations ... which you believe may be inconsistent with his or her alleged intent to defraud ...." From appellant's standpoint, this instruction was crucial to her defense because, as already discussed, the fact that Scott desired a replacement car rather than the insurance proceeds, and then later repurchased her car from the insurance company, was evidence of her lack of intent to defraud Stonewall. Indeed, these circumstances were consistent with her position that Wilson had taken the Cadillac against her will and that her theft claim was legitimate.

■ Rather than utilize appellant's proposed instruction, the Judge instructed the jury that:

Ordinarily, intent may not be proved directly, because there is no way of fath-

oming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from all of the surrounding circumstances. *You may consider any statement made or act done by either defendant, and all other facts and circumstances in evidence which indicate a state of mind.* (Emphasis added.)

Scott argues that this instruction was too general as well as misleading, rendering it meaningless to the jury in the light of all the circumstances in this case. Yet, while the charge did not specifically instruct the jury that it could weigh the subsequent acts which Scott considered vital to her defense, the emphasized language makes clear that the jury could consider any evidence that had a bearing on appellant's state of mind. This would certainly include the later circumstances that Scott wished to bring to the jury's attention and which she felt demonstrated her lack of intent to defraud. Since "[a] trial judge is not required to give a requested instruction if the subject matter of the instruction is substantially covered in the judge's general charge", *United States v. Carabbia,* 381 F.2d 133, 138 (6th Cir.), *cert. denied,* 389 U.S. 1007, 88 S.Ct. 564, 19 L.Ed.2d 602 (1967) (citations omitted), and, because the instruction did not treat the issue of specific intent to defraud unfairly or inadequately, this Court should not interfere with such instruction. *United States v. Ray,* 683 F.2d 1116, 1127 (7th Cir.1982), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1983); *United States v. Patrick,* 542 F.2d 381, 389 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

### IV

As a final point, Scott assigns as error the fact that the District Judge admitted into evidence certain statements made by appellant Wilson and overheard by Joseph Vernon concerning Scott's alleged desire to sell her Cadillac. *Supra,* p. 6. Scott asserts that this ruling alone is ground for a new trial, since the statements connected her with appellant Wilson without the appropriate foundation having been laid.

■ Rule 801(d)(2)(E) of the Federal Rules of Evidence characterizes statements made by a "coconspirator ... during the course and in furtherance of the conspiracy" as nonhearsay. Statements made by coconspirators in a mail fraud scheme are admissible according to the same rules. *United States v. Lutz,* 621 F.2d 940 (9th Cir.), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980) and 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981). However, before the court allows into evidence statements made by one defendant against another under the coconspirator exception, it must find "the existence of and the [defendant's] participation in the conspiracy" by a fair preponderance of independent evidence. Fed.R.Evid. 104; *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 320 (4th Cir.1982). See also *United States v. Ammar,* 714 F.2d 238, 247 (3d Cir.1983); *United States v. Jones,* 542 F.2d 186, 202–203 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Consequently, the coconspirator rule has evolved into a two pronged procedure: first, the trial judge, as a matter of law, determines the admissibility of the statements according to the independent evidence test and, second, the jury then determines the credibility to be accorded any statements previously admitted under such rule.

■ Presently, Scott avers that the trial judge never made an independent determination as to the existence of a conspiracy before allowing the jury to consider the statements just related as made by appellant Wilson. However, as was said in *United States v. Lutz,* 621 F.2d at 947, the requisite independent determination on the part of the Judge as to the existence of a conspiracy need not be explicit. " 'Submission of the case to the jury, with instruc-

tions that it can consider co-conspirators' statements, is an indication that the court has found independent evidence establishing a prima facie case [of a conspiracy]. We will not find error unless the evidence is insufficient.' " *Id.* at 947, (citation omitted). Here, while the instruction to the jury on the coconspirator exception was not as clear as it might have been,[5] it can be construed as an indication that the court found a conspiracy to exist independently of appellant Wilson's statements. Thus, the absence of an explicit finding of the existence of a conspiracy is not error.

Finally, had we not been able so to construe the instruction as being evidence of the Judge's independent finding of a conspiracy, considering Scott's relationship with Wilson and her filing of the false car theft report, we could not say that there was insufficient evidence to establish the existence of a conspiracy. Therefore, any procedural error in admitting the statements would be harmless.

### V

The convictions of appellants Scott and Wilson on Counts Two, Three, and Four of the indictment are affirmed. Their convictions as to Count One are reversed.

AFFIRMED IN PART; REVERSED IN PART.

---

**5.** Instruction No. 9 reads as follows:

"An admission or incriminating statement made, or act done, by one person, outside of court, may not be considered as evidence against any person who was not present and saw the act done or heard the statement made; unless, of course, such party subsequently ratifies such act or statement by such other person."