**UNITED STATES of America, Appellee,**

v.

**Sihadej CHINDAWONGSE a/k/a Rajburi, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Boripat SIRIPAN, Appellant.**

**Nos. 82–5265(L), 82–5266.**

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1985.

Decided Aug. 28, 1985.

Robert L. Flax, Richmond, Va., Mary M. Runnells, Bloomfield, Ind., for appellants.

Ty Cobb, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore Md., Susan M. Marzetta, Third Year Law Student, on brief), for appellee.

Before MURNAGHAN, ERVIN and SNEEDEN, Circuit Judges.

ERVIN, Circuit Judge:

Boripat Siripan and Sihadej Chinda-wongse a/k/a Rajburi appeal their convictions by a jury for conspiring to distribute heroin and for conspiring to possess heroin with the intent to distribute, both in violation of 21 U.S.C. § 846 (1982). In addition, Chindawongse appeals his conviction on two counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982). For his crimes, Chinda-wongse was sentenced to thirty years in prison and was fined $75,000. He also received a special parole term of six years.

Siripan was sentenced to fifteen years in prison and was fined $15,000.

Chindawongse and Siripan now assert several different grounds for reversal on appeal. After careful consideration of each allegation of trial error, we are convinced that reversal is not required. Consequently, we refuse to disturb the appellants' convictions and affirm the judgments of the district court.

I.

In March and April of 1982, Paul Primiano agreed to purchase a substantial quantity of heroin from Alexander Steubing, an American citizen, and Boonyarit Voravitha-ya ("BV"), a Thai national travelling in the United States. On March 27, 1982, Steubing met BV in Los Angeles and together they drove to Chicago. While in Chicago, BV obtained 1½ pounds of heroin from Sihadej Chindawongse, who at that time was serving as the Vice Consul of the Royal Consulate of Thailand in Chicago. On March 29, 1982, Steubing and BV drove to Carteret, New Jersey to meet Primiano and make the sale. On April 2, 1980, BV returned to Chicago and, two days later, flew back to New Jersey carrying with him another 1½ pounds of heroin which he had received from Chindawongse. Upon BV's return, Steubing flew to Baltimore and distributed a small heroin sample to Gary Duggins. The next day, Steubing returned to New Jersey. On April 7, 1982, Steubing and BV travelled together to Baltimore and Steubing once again gave Duggins a small sample of heroin. On April 9, 1982, Steubing and BV were arrested as they attempted to flee from DEA agents in Baltimore. A search of their luggage uncovered a pound of 91% pure heroin and $54,670 in cash.

Upon his arrest, BV gave a complete and full confession and agreed to cooperate in facilitating the arrest of his co-conspirators by acting as an undercover agent.[1] In this capacity, BV made a number of monitored

---

1. BV agreed to plead guilty to conspiring to distribute heroin in violation of 21 U.S.C. § 846 (1982).

tape recorded telephone calls to Viroj Chitmongkollert (a/k/a Ang) and Pirom Chongcharoen (a/k/a Dang), his alleged heroin suppliers and superiors in Thailand, to Chindawongse in Chicago, and to Primiano in New Jersey. Chitmongkollert and Chongcharoen told BV that he was to pay their messenger in New York City the $60,000 which BV at that time owed them. After the $60,000 payment was made, the Thai suppliers told BV he would be able to receive three pounds of heroin from Chindawongse in Chicago.

Pursuant to his instructions from Chitmongkollert and Chongchareon, BV telephoned Boripat Siripan in Room 902 at the Sheraton City Squire Hotel in New York City on April 15, 1982 and arranged a meeting for the following day. Siripan was registered in Room 902, and hotel records reflect that during his stay at the hotel he telephoned the numbers in Thailand used by Chitmongkollert and Chongchareon.

On April 16, 1982, while under DEA surveillance, BV met with Siripan in the lobby of the Sheraton City Squire Hotel. BV was carrying with him the $60,000 in cash. BV and Siripan had a drink together at the bar, and then entered the elevator. The elevator proceeded directly to the ninth floor. BV returned to the hotel lobby soon thereafter without Siripan or the $60,000 in cash.

Subsequently, BV proceeded to Chicago with DEA agents to receive the three pounds of heroin from Chindawongse that was now made available to BV as a consequence of his $60,000 exchange with Siripan. On April 20, 1982, BV received two pounds of 98% pure heroin from Chindawongse at the Little Corporal Restaurant in Chicago. The next day, after BV placed another call to Chitmongkollert in Thailand, BV received an additional pound of 98% pure heroin from Chindawongse at the same restaurant. Both transactions were

under DEA surveillance. Finally, on April 27, 1982, Chindawongse retrieved a diplomatic pouch addressed to the Royal Consulate of Thailand at Chicago's O'Hare International Airport. Later that day, after taking the pouch back to the Thai consulate, Chindawongse was observed holding a "distinctive" bag outside the Thai consulate's office. Three days later, on April 30, 1982, Chindawongse was arrested in Chicago. A search of his home uncovered the same distinctive bag observed by DEA agents three days before. It contained 4½ pounds of 98% pure heroin.

Meanwhile, on April 29, 1982, Chitmongkollert advised BV to meet with Siripan once again. BV was told to pay Siripan $240,000 which would enable BV to receive 4½ pounds of heroin from Chindawongse in Chicago. Chitmongkollert gave BV a telephone number in California at which he would be able to contact Siripan. Subsequently, on May 2, 1980, DEA agents arrested Siripan at the address for which that California telephone number was listed. A search of Siripan's house revealed an address book with the telephone numbers in Thailand used by Chitmongkollert and Chongchareon, used plane tickets to New York confirming his presence in the city on April 16, 1982, another used ticket indicating his travel from Bangkok, Thailand to California on April 30, 1982, and a message in Thai, translated variously as "friend from Muangthong Housing Estate has gone to inquire about the [stuff, article or thing] instructed from Huahin." [2]

One week later, on May 9, 1982, BV became the victim of an apparent suicide. Subsequently, Siripan and Chindawongse were indicted, tried by a jury, convicted of conspiring to distribute heroin and to possess heroin with intent to distribute,[3] and sentenced to substantial terms of imprisonment. Each now asserts two principal ar-

---

**2.** This message, consistent with other coded writings in the conspiracy, used geographic locations in Thailand to identify members of the conspiracy. This message, asserts the government, instructs Siripan to receive a package from one individual in trust for another.

**3.** In addition, Chindawongse was convicted on two substantive counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982).

guments for reversal of their convictions on this appeal.

II.

Siripan's principal contention on appeal is that BV's tape recorded conversations with Chindawongse and his co-conspirators were improperly admitted into evidence against Siripan because (1) the statements are hearsay, and (2) their admission violated the confrontation clause. We will consider each argument in turn.

A. *Hearsay*

■  Out-of-court statements made by co-conspirators "during the course of and in the furtherance of the conspiracy" are not hearsay and are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. However, in order for these statements to be admitted against a co-conspirator under this exception to the hearsay rule, the district court must first find " 'the existence of and the [defendant's] participation in the conspiracy' by a fair preponderance of independent evidence." *United States v. Scott*, 730 F.2d 143, 148 (4th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 572, 83 L.Ed.2d 512 (1985) (quoting *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 320 (4th Cir.1982)); *see also United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir.1983), *cert. denied,* sub nom., *Jackson v. United States,* — U.S. —, 104 S.Ct. 2656, 81 L.Ed.2d 363, 363 U.S. —, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Siripan argues that the tape recorded conversations were erroneously admitted into evidence because there was no independent evidence that either the parties to the conversations or Siripan himself were involved in a conspiracy to import and distribute heroin. We disagree.

As an initial matter, the government clearly produced enough independent evidence to prove the existence of an international conspiracy to import and distribute heroin in the United States through the Royal Consulate of Thailand in Chicago. The testimony of various DEA agents, the introduction into evidence of numerous telephone, hotel and airline records, and the production of the physical evidence seized from the appellants and their co-conspirators together constitute "prima facie proof of the conspiracy." *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir.1973). Consequently, our analysis shifts to a consideration of whether Siripan's participation in this conspiracy was proven "by a fair preponderance of independent evidence." *Scott*, 730 F.2d at 148.

The standard by which we must judge the sufficiency of Siripan's participation was set forth by this court in *United States v. Laughman*, 618 F.2d 1067, 1076 (4th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980) as follows:

"Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of the defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy."

(quoting *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir.1977) (emphasis in original); *see, e.g., United States v. Spoone*, 741 F.2d 680, 685 (4th Cir.1984). "The evidence of the 'slight connection', however, must be of the quality which will reasonably support a conclusion that the defendant wilfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy." *United States v. Miranda-Uriarte*, 649 F.2d 1345, 1349–50 (9th Cir.1981).

■  In the case at bar, the government produced sufficient independent evidence of Siripan's connection to the conspiracy to establish his knowing and willful participation in the conspiracy. On April 16, 1982, Siripan met with BV in the lobby of the New York Sheraton City Squire Hotel. They had a drink together at the hotel bar and then rode the elevator to the ninth floor. Siripan had a room on the ninth floor, room 902. BV was carrying $60,000 when he entered the elevator. He did not have the money when he returned to the hotel lobby several minutes later. In addition, telephone records at the hotel and at

the house in which Siripan lived in California indicated that Siripan had telephoned the numbers in Thailand used by Chitmongkollert and Chongchareon, allegedly the drug suppliers in the Far East. Siripan had these numbers in his address book when he was arrested. A search of Siripan's house also revealed (1) used airplane tickets from Los Angeles to New York thus confirming his presence in New York City at the time of BV's $60,000 payoff to free up the additional three pounds of heroin in Chicago, (2) a used airplane ticket indicating his travel from Bangkok, Thailand to Los Angeles on April 30, 1982, the very day Chitmongkollert had advised BV that his messenger would arrive in California, and (3) a coded Thai message translated variously as "friend from Muangthong Housing Estate has gone to inquire about the [stuff, article or thing] intrusted from Huahin" and meaning that Siripan was to receive a package from one individual in trust for another. Taken together, these inculpatory pieces of evidence and all the inferences that logically may be drawn from them "reasonably support a conclusion that [Siripan] wilfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy." *Miranda-Uriarte,* 649 F.2d at 1349–50. Since this evidence establishes the requisite "independent evidence" of Siripan's participation in the conspiracy, the tape recorded conversations of Siripan's co-conspirators were admissible against him under Fed.R. Evid. 801(d)(2)(E).[4] *See United States v. Mitchell,* 733 F.2d 327, 330 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 520, 83 L.Ed.2d 409 (1985); *United States v. Lee,* 726 F.2d 128, 132 (4th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3540, 82 L.Ed.2d 844 (1984); *United States v. Lisotto,* 722 F.2d 85 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984); *United States v. Kelly,* 718 F.2d 661, 663–64 (4th Cir.1983); *Hines,* 717 F.2d at 1488; *United States v. Robinson,* 707 F.2d 811, 813 (4th Cir.1983); *United States v. Dockins,* 659 F.2d 15, 16–17 (4th Cir.1981); *United States v. McCormick,* 565 F.2d 286, 289–90 (4th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978).

## B. *The Confrontation Clause*

Siripan also argues that his sixth amendment rights were violated by the admission of the tape recorded conversations without his having an opportunity to cross-examine the declarants on the tapes.[5] He contends that because "the statements are not sufficiently trustworthy to pass constitutional muster," they may not be admitted into evidence under the Supreme Court's decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). We do not agree.

In *Ohio v. Roberts,* the Supreme Court held that the introduction of hearsay statements against a criminal defendant will not violate the confrontation clause of the sixth amendment if (1) the government establishes that the declarant is unavailable, and (2) the statements to be admitted bear sufficient "indicia of reliability." *Id.* at 65, 100 S.Ct. at 2539. However, the Court went on

---

**4.** The trial court "technically erred" by permitting the jury to determine whether the consensually monitored tape recorded conversations were admissible under Fed.R.Evid. 801(d)(2)(E). *See Spoone,* 741 F.2d at 686 n. 1. Whether out-of-court statements made by co-conspirators "during the course of and in furtherance of the conspiracy," Fed.R.Evid. 801(d)(2)(E), are admissible or not is "a legal question to be resolved by the trial court," *Spoone* 741 F.2d at 681 n. 1, upon a consideration of the sufficiency of the independent evidence indicating "the existence of and the [defendant's] participation in the conspiracy." *Portsmouth Paving Corp.,* 694 F.2d at 320; *see also, e.g., Vaught,* 485 F.2d at 323; *Hines,* 717 F.2d at 1488; *United States v.*

Jones, 542 F.2d 186, 203 n. 33 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). However, as we concluded in *Spoone,* because we have "independently reviewed the record and have concluded that [the tape recorded conversations] were admissible, this ['technical'] error ... was harmless." *Spoone,* 741 F.2d at 686 n. 1.

**5.** The principal declarants were unavailable at trial because (1) BV had apparently committed suicide prior to trial, (2) Chitmongkollert and Chongcharoen were fugitives in Thailand, and (3) Chindawongse was Siripan's co-defendant at trial.

to explain that "reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. at 2539. Consequently, the issue presented for resolution on this appeal is whether statements of an unavailable declarant that are admissible under the co-conspirator's exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), necessarily satisfy the requirements of the confrontation clause by virtue of the Supreme Court's decision in *Roberts.* [6]

In resolving this issue, the Second, Third, Eighth and Ninth Circuits have held that the requirements of admissibility under Rule 801(d)(2)(E) are not identical to the requirements under the confrontation clause and that "courts must assess the circumstances of each case to determine whether the statements carry with them sufficient indicia of reliability." *Sanson v. United States,* 727 F.2d 1113 (7th Cir.1984), *cert. denied,* — U.S. —, 104 S.Ct. 3559, 82 L.Ed.2d 861 (1984) (White, J., dissenting). *See United States v. Wright,* 588 F.2d 31, 37–38 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Ammar,* 714 F.2d 238, 254–57 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Massa,* 740 F.2d 629, 638–640 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *United States v. Kelley,* 526 F.2d 615, 620–21 (8th Cir.1975), *cert. denied,* 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976); *United States v. Perez,* 658 F.2d 654, 660 and n. 5 (9th Cir.1981). However, the First, Fifth and Seventh Circuits have held that statements admissible under Rule 801(d)(2)(E) are presumptively reliable and therefore admissible under the confrontation clause. *See Ottomano v. United States,* 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States*

*v. Peacock,* 654 F.2d 339, 349–350 (5th Cir. 1981), *cert. denied,* — U.S. —, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983); *United States v. Xheka,* 704 F.2d 974, 987 n. 7 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977).

The Fourth Circuit's resolution of this issue is somewhat confusing. In *United States v. Lurz,* 666 F.2d 69, 80–81 (4th Cir.1981), *cert. denied, sub. nom. Magill v. United States,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 *sub nom. Steedman v. United States,* 457 U.S. 1136, 102 S.Ct. 2966, 73 L.Ed.2d 1354 and 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982), we seemed to cast our lot with the First, Fifth and Seventh Circuits by declaring, "[t]he Lurz statements came in under FRE 801(d)(2)(E) as exceptions to the hearsay rule. So admitted, they do not violate the confrontation clause." However, two years later, in *United States v. Lissoto,* 722 F.2d 85, 88 (4th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984), we made an assessment of whether or not the hearsay statements carried with them sufficient indicia of reliability in order to satisfy the requirements of the confrontation clause despite the fact that we had previously concluded in that case that the statements were admissible under Rule 801(d)(2)(E). Consequently, we have adopted seemingly contradictory positions in resolving this issue.

■ It is clear, however, that *Lissotto* did not concern itself with the Supreme Court's invitation to infer the reliability of these statements where they are in a "firmly rooted" exception to the hearsay rule. *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. It is our conclusion that the Rule 801(d)(2)(E) co-conspirator's exception to the hearsay rule is just such a "firmly rooted hearsay exception." The Supreme Court has long held that the confrontation

---

**6.** The Supreme Court has recently denied petitions for certiorari directly raising this issue on at least two occasions. *See Sanson v. United States,* 727 F.2d 1113 (7th Cir.1984), *cert. denied,* — U.S. —, 104 S.Ct. 3559, 82 L.Ed.2d 861 (1984); *Gibbs v. United States,* 739 F.2d 838, 847

(3d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); *see also Masi v. United States,* 742 F.2d 1442 (2d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985).

clause countenances only hearsay that is so trustworthy that it "augments accuracy in the factfinding process." *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2539; *see Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). " '[T]he hearsay rules and the confrontation clause are generally designed to protect similar values', *California v. Green,* 399 U.S. 149, 155 [90 S.Ct. 1930, 1933, 26 L.Ed.2d 489] (1970), and 'stem from the same roots,' *Dutton v. Evans,* 400 U.S. 74, 86 [91 S.Ct. 210, 218, 27 L.Ed.2d 213] (1970)." *Roberts,* 448 U.S. at 67, 100 S.Ct. at 2540. However, "certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.' " *Id.* at 67, 100 S.Ct. at 2540 (quoting *Mattox v. United States,* 156 U.S. 237, 244, 155 S.Ct. 337, 340, 39 L.Ed. 409 (1895)). Fed.R.Evid. 801(d)(2)(E) permits the introduction into evidence of a statement against a party made by his co-conspirator "during the course of and in furtherance of the conspiracy." As indicated above, such a statement can only be admitted, however, if the government first proves "the existence of and the [defendant's] participation in the conspiracy by a fair preponderance of independent evidence." *Scott,* 730 F.2d at 148. It is our conclusion that evidence admitted under this Rule 801(d)(2)(E) standard bears sufficient "indicia of reliability" and "guarantees of trustworthiness" to satisfy the commands of the confrontation clause.

Consequently, we reaffirm this court's holding in *Lurz* that the requirements of admissibility for out-of-court statements by unavailable co-conspirators under Rule 801(d)(2)(E) are identical to the requirements for admissibility under the confron-

tation clause. Since the tape recorded conversations implicating Siripan were properly admitted in evidence under Rule 801(d)(2)(E), their admission does not violate the confrontation clause.

### III.

Siripan's remaining argument on appeal is that the government did not produce sufficient evidence at trial to support his conviction. This argument is totally without merit.

■ Viewing the evidence in the light most favorable to the government, *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982), it is clear that a rational jury could have reasonably found Siripan guilty of knowingly participating in a conspiracy to distribute heroin beyond a reasonable doubt. The facts which provide independent evidence of Siripan's participation in the criminal conspiracy,[7] taken together with the tape recorded conversations between BV and his Thai drug suppliers, are more than sufficient evidence of Siripan's participation in the conspiracy to support his conviction.

### IV.

■ Chindawongse also raises two issues on this appeal, neither of which has merit. First, Chindawongse argues that the denial of his motion for severance improperly prevented him from introducing exculpatory evidence which he contends could only have been introduced at a separate trial. However, Chindawongse did not set forth particularized facts and circumstances in his motion to sever which indicated that his right to a fundamentally fair trial would be sacrificed by a denial of his motion.[8] *See United States v. Parodi,* 703

---

7. *See* Section II A, *supra* at 7–11.

8. Chindawongse's motion to sever reads as follows:

1. This Defendant, SIHADEJ CHINDA-WONGSE, is impermissibly joined with the remaining Co-Defendants in violation of Rule 8 of the Federal Rules of Criminal Procedure.

2. The Defendant-Petitioner may testify on behalf of one or several of the Co-Defendants in this cause.

3. One or several of the other Co-Defendants may testify on behalf of the Petitioner.

4. If the Petitioner is not severed from the Co-Defendants, he will not be able to testify or possibly benefit from their testimony.

F.2d 768, 780 (4th Cir.1983); *United States v. Shuford,* 454 F.2d 772, 780 (4th Cir. 1971). He merely asserts "vague and conclusory" allegations which fail to "establish the 'exculpatory nature and effect' of the co-defendant's testimony," and, therefore, are inadequate grounds for an order of severance. *Parodi,* 703 F.2d at 780 (quoting *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980)). Indeed, given the extent of the evidence in the record against Chindawongse,[9] severance would have at most enabled Chindawongse to only have a "better chance of acquittal" or "an opportunity to proffer evidence which 'merely contradicts part of the Government's proof.' " *Parodi,* 703 F.2d at 780 (quoting *United States v. West,* 670 F.2d 675, 680 (7th Cir.1982), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1983)). Such a result may not justify an order of severance. The denial of severance in this case did not "deprive the defendant of a fair trial" and did not "result in a miscarriage of justice." *United States v. Becker,* 585 F.2d 703, 706 (4th Cir.1978), *cert. denied,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979); *see Parodi,* 703 F.2d at 780. Accordingly, the district court did not err in denying Chindawongse's motion.

> 5. Failing to sever the Petitioner from the other Co-Defendants, with whom he has never had any contact, will cause extreme prejudice. (JA 5–6).

**9.** The evidence against Chindawongse is even referred to as "overwhelming" in his own brief. *See* Appellants' Brief at 19.

**10.** Thailand was a signatory to both the Vienna Diplomatic Relations and Consular Relations Treaties. *See* 23 U.S.T. at 3429 and 21 U.S.T. at 367. Because Thailand had not formally ratified either treaty at the time of Chindawongse's arrest and prosecution, general consular relations between the United States and Thailand were then and are now determined by the bilateral Treaty of Amity and Economic Relations, May 29, 1966, United States-Thailand, 19 U.S.T. 5843, T.I.A.S. No. 6540 (effective June 8, 1968). In an exchange of notes that were made a part of this treaty as ratified, the two countries agreed that their consular officers and agents "shall be entitled on condition of reciprocity to ... enjoy all the ... exemptions and immunities of every kind which are, or may be, accorded to

Chindawongse's second contention on appeal is that as the Vice-Counsul of the Royal Consulate of Thailand in Chicago, he was entitled to a diplomatic immunity from prosecution for his alleged crimes. However, as a Thai consular officer, Chindawongse was not entitled to absolute diplomatic immunity. *See* 22 U.S.C. §§ 254a–254e (1982) (codifying the Diplomatic Relations Act). Such is the privilege only of those diplomatic agents assigned to the Thai embassy in Washington, D.C. *See, id.,* §§ 254a, 254c; Vienna Convention on Diplomatic Relations, *opened for signature* April 18, 1961, art. 29, 23 U.S.T. 3227, 3240, T.I.A.S. No. 7502. Instead, pursuant to the Vienna Convention on Consular Relations, *opened for signature* April 24, 1963, art. 41, 21 U.S.T. 77, 103, T.I.A.S. No. 6820, consular officers such as Chindawongse may be arrested or detained, but only "in the case of a grave crime and pursuant to a decision by a competent judicial authority."[10]

In this case, Chindawongse was arrested pursuant to a warrant issued by a federal magistrate and was indicted by a federal grand jury for various felony drug offenses under Title 21 of the United States Code. A federal magistrate and a federal grand jury are "competent judicial

consular officers of the most favored nation." *Id.* at 5875, 5877, 5879.

The United States State Department interprets the "condition of reciprocity" to mean that for the "condition" to take effect, both Thailand and the United States must negotiate an agreement with respect to special consular immunities, beyond that of international law. As there has been no such "special" agreement negotiated, the United States does not recognize any Thai consular immunities greater than those demanded by international law under the Vienna Convention.

Although Thailand has still not ratified the Vienna Consular Relations Treaty, that Treaty codifies international law on consular relations and is adhered to by both the United States and Thailand. Thus, its provisions detail the actual immunities enjoyed by Thai consular officers in the United States. Those immunities do not extend to insulating consular officials from prosecution for grave offenses such as conspiracy to distribute and distribution of heroin.

authorities" in the United States and felony drug offenses under Title 21 are "grave crimes." Consequently, since Chindawongse was arrested and indicted "pursuant to a decision by a competent judicial authority" in the United States, it was proper to prosecute him for the "grave crimes" alleged in his indictment. Chindawongse was not entitled to an immunity from prosecution in this case.

### IV.

For the foregoing reasons, the convictions of the appellants are

AFFIRMED.