# Staunton.

## VES COTTRELL v. COMMONWEALTH.

### September 21, 1922.

1. CONTINUANCES—*Discretion of Trial Court—Appeal.*—The matter of continuances is left to the sound discretion of the trial court, under all the circumstances of the case, and, where that discretion has not been abused, and the judgment of the court is not plainly erroneous, the Supreme Court of Appeals will decline to disturb its ruling.

2. CONTINUANCES—*Absence of Witness—Diligence.*—The judgment of the trial court refusing to grant a continuance on account of the absence of a material witness will not be reversed unless it is shown that the party complaining has exercised due diligence to secure the presence of the witness.

3. CONTINUANCES—*Absence of Witness—Diligence—Case at Bar.*—In the instant case accused had asked for and obtained a continuance on the ground of the absence of three material witnesses. It appeared that the witnesses in question were in the county "off and on." After the case was continued, no rule was asked for against them, no other summonses were issued for them, and no other action was taken on behalf of the accused to insure their attendance, except that their promise to be present was secured.

   *Held:* That this was not the exercise of due diligence on the part of the accused, and that it could not be said that the trial court plainly erred in refusing to grant him a further continuance.

4. CONSPIRACY—*Declarations of Co-Conspirators—Establishment of Conspiracy.*—In a criminal prosecution until a conspiracy has been *prima facie* established the declarations of his alleged co-conspirators, made out of the presence of defendant, are not admissible as evidence against him.

5. CONSPIRACY—*Declarations of Co-Conspirators—Establishment of Conspiracy—Case at Bar.*—In the instant case, a prosecution for the malicious wounding of one R, it sufficiently appeared that the accused and those jointly indicted with him were engaged in the illicit buying and selling of ardent spirits; that R, in his efforts to break up the violations of the law by them, had incurred their enmity; and that a gun had been provided and a purse made up to pay the man who would kill him from ambush. An examination of the record established a *prima facie* case of conspiracy, and therefore, threats of

defendant's alleged co-conspirators against R, although made some months before the crime, were admissible against him.

6. APPEAL AND ERROR—*Harmless Error—Admission of Hearsay Evidence.*—In a prosecution for maliciously wounding one R, the court allowed a witness to tell what two other witnesses, then in attendance, said with reference to the attempt of the accused to hire these witnesses to kill R. The witnesses were sworn for the Commonwealth and testified that accused tried to hire them to kill R.

   *Held:* That while technically speaking the evidence was hearsay, yet it did not constitute reversible error.

7. APPEAL AND ERROR—*Reversal—Error must be Prejudicial.*—To be ground for reversal the error must be material, and must be prejudicial to the interest of the party complaining.

8. APPEAL AND ERROR—*Petition as Pleading—Assignment of Error.*—A petition for a writ of error is in the nature of a pleading, and must state clearly and distinctly the errors relied on to reverse the judgment.

9. ASSIGNMENT OF ERRORS—*Evidence Insufficient to Support Instruction—Insufficient Assignment.*—An assignment of error in general terms which requires the appellee or the court to hunt through the record to ascertain what the evidence is that the plaintiff in error considers insufficient to support an instruction, when the plaintiff in error could easily point it out, places a burden upon the court which it ought not to be expected to bear.

10. ASSAULT AND BATTERY—*Malicious Wounding—Evidence Sufficient to Support Conviction.*—In the instant case, a prosecution for maliciously wounding a police officer charged with the enforcement of the prohibition law, the evidence established a conspiracy among accused and other violators of the law to kill the officer. Threats by accused and his co-conspirators against the officer, purchase of guns and ammunition by accused, together with the conduct of accused before and after the crime, and circumstantial evidence pointing to the accused as the guilty party were held sufficient to support a verdict of guilty, notwithstanding accused's evidence of an alibi and impeachment of the Commonwealth's testimony by other witnesses.

Error to a judgment of the Circuit Court of Lee county.

*Affirmed.*

The opinion states the case.

*Pennington & Pennington* and *D. F. Kennedy*, for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

WEST, J., delivered the opinion of the court.

Ves Cottrell, the accused, who was jointly indicted with Biddle Astrop, Bill Barker, John Blakemore, Rich. Cooper and Tom Cornette, for maliciously wounding Charles H. Redman, was convicted by a jury and sentenced to the penitentiary for ten years. The case is here upon a writ of error to that judgment.

The accused relies on six assignments of error.

First, the court's refusal to continue the case on account of the absence of three witnesses, Dana Gilbert, Frank Wygal and Coy Freeman.

The case was called for trial on the 21st day of September, 1921. The accused moved for a continuance on the ground of the absence of these witnesses, who were alleged to be material. Summonses had been issued for them and two of them had accepted service at Middleboro, Ky., while the third had been summoned by a county constable. The court continued the case to September 30th, at which time, on account of the absence of the same witnesses, the accused moved for a continuance to the next term, on the ground that their testimony was material and that there was no other person by whom the same facts could be proved.

It appears from the record that these witnesses, while residents of Lee county, were out of the State working for the Louisville and Nashville Railroad, but made frequent visits of a day or two at their homes.

[1, 2] The matter of continuances is left to the sound discretion of the trial court, under all the circumstances of the case, and where that discretion has not been

abused and the judgment of the court is not plainly erroneous, this court will decline to disturb its ruling. We will not reverse the judgment of the trial court for refusing to grant a continuance on account of the absence of a material witness unless it is shown that the party complaining has exercised due diligence to secure his presence.  *Roussell* v. *Commonwealth*, 28 Gratt. (69 Va.) 930; *Va. Iron, Coal & Coke Co.* v. *Kiser*, 105 Va. 695, 54 S. E. 889.

[3] It appears from the record that the witnesses in question were "off and on" in the county, yet, after the case was continued on September 21st to September 30th, no rule was asked for against them, no other summonses were issued for them and no other action was taken on behalf of the accused to insure their attendance, except to go to Kentucky and secure their promise to be present.  This was not the exercise of due diligence on the part of the accused and we cannot say that the court plainly erred in refusing to grant him a further continuance.  The first assignment is without merit.

The second assignment alleges that "the court erred in admitting the evidence of threats, alleged to have been made some months before the act of the commission of the crime, by Barker, Cornette and Astrop."

[4] It is true, as contended by the accused, that until a conspiracy has been *prima facie* established the declarations of his alleged co-conspirators, made out of his presence, are not admissible as evidence against the prisoner.  The evidence against the accused was circumstantial and the Commonwealth proceeded on the theory that a conspiracy existed between him and those jointly indicted with him, to kill Charles H. Redman, who was the prohibition enforcement officer in Lee county.

[5] The threats, evidence of which was objected to, were these: Bob Williams testified that "Bill Barker talked about Redman as though he was meddling in his business, and said he was going to get killed and that there could be a good jack pot made up for his killing." He also testified that "Biddle Astrop said if Redman ever meddled in his business he would kill him;" and that Tom Cornette, who had been convicted and punished for bootlegging on the testimony of Redman, said "if he ever had an opportunity he would match Redman back." Mrs. Williams testified that "Bill Barker warned her that her husband would be killed if he did not quit working with Redman." W. B. McGlamory testified that "Biddle Astrop on Christmas eve, 1920, said something about 'the St. Charles mob' but made no threat against any particular person." S. L. McLain testified that Biddle Astrop spoke of "shooting hell out of Redman."

We do not deem it necessary to discuss the evidence in detail. It sufficiently appears that the accused and those jointly indicted with him were engaged in the illicit buying and selling of ardent spirits in Lee county; that Redman, in his efforts to break up the violations of the law by them, had incurred their enmity; and that a gun had been provided and a purse made up to pay the man who would kill him from ambush.

A careful examination of the record convinces us that a *prima facie* case of conspiracy was established, and that the evidence of threats objected to was properly admitted. This assignment is likewise without merit.

[6, 7] The third assignment is based on the action of the court in allowing the witness, Matt Helan, to tell what the witnesses, Carl Helan and Jack Catron, then in attendance on the court, said with reference to the attempt of the accused to hire these witnesses to kill Redman.

Both Carl Helan and Jack Catron were sworn as witnesses for the Commonwealth and testified that the accused tried to hire them to kill Redman, furnished them with a high powered gun with which to shoot him and promised them $500.00 each for their services. While technically speaking the testimony of Matt Helan complained of may be regarded as hearsay, yet, under the circumstances, we find no reversible error in the ruling of the court in this matter. To be ground for reversal the error must be material and must be prejudicial to the interest of the party complaining and we are of the opinion the accused was not prejudiced by the testimony complained of.

The fourth assignment relates to the action of the court in permitting Charles H. Redman to testify to the attitude of the accused and his alleged co-conspirators towards him.

In the petition for the writ of error it is stated that the objection which the petitioner makes here is the same made under his second assignment. It follows, for the reasons given in disposing of the second assignment, we find no merit in the fourth assignment.

[8, 9] The fifth assignment is "of error in instruction one given for the Commonwealth; error in amending defendant's instructions two and four, and refusing number six offered by the defendant." The petition for the writ of error does not point out or discuss any error in the action of the court in granting or refusing instructions, but merely asks the right to discuss them later, if so desired.

A petition for a writ of error is in the nature of a pleading and must state clearly and distinctly the errors relied on to reverse the judgment.

"To require the appellee or the court to hunt through the record for every conceivable error which the court

below may have committed, when none has been pointed out by the party complaining of the judgment, would obviously be unreasonable and oppressive on a party recovering judgment, and most burdensome on the court, unnecessarily impeding the progress of business; and, by the confusion and uncertainty which it would beget as to questions on which the case was decided in the court below, destroy its character as an appellate tribunal; and by the multiplicity of the questions for discussion tend much more to confusion and error in its own decisions than the correction of errors which may in fact have occurred in the district court." *Clements* v. *Hearne*, 45 Tex. 415.

The party complaining must "lay his finger on the error." An assignment of error in general terms which requires the appellee or the court to hunt through the record to ascertain what the evidence is that the plaintiff in error considers insufficient to support an instruction, when the plaintiff in error could easily point it out, places a burden upon the court which it ought not to be expected to bear. *Lorillard Co.* v. *Clay*, 127 Va. 748, 104 S. E. 384; *Bank* v. *Trigg Co.*, 106 Va. 327, 56 S. E. 158; *Worley* v. *Mathieson Alkali Works*, 119 Va. 862, 89 S. E. 880; *Rust* v. *Reid*, 124 Va. 1, 97 S. E. 324; *Deitz* v. *High*, 131 Va. 7, 109 S. E. 215; *Deitz* v. *Whyte*, 131 Va. 19, 109 S. E. 212; *Washington So. R. Co.* v. *Cheshire*, 109 Va. 741, 65 S. E. 27.

It follows that the errors, if any, committed by the court in granting and refusing instructions are not sufficiently assigned under section 3464 of the Code to require consideration by this court.

[10] The only remaining error assigned is the refusal of the trial court to set aside the verdict as contrary to the law and the evidence.

The evidence on behalf of the Commonwealth is largely circumstantial.

Charles H. Redman was a county policeman charged with the enforcement of the prohibition law in Lee county.    On August 2, 1921, he was engaged in running down violators of this law.    Returning to his home about 11.30 a. m., he took off his gun and made himself comfortable and laid down in a folding chair on his porch, with his feet higher than his head.    In less than thirty minutes he was shot from ambush.    The ball, a steel jacketed cartridge, entered the lower juncture of his leg and passed up the leg and near his ribs and lodged in his shoulder.    The shot came from a bluff, partly covered with bushes, located in front of the house, and an examination of the place from which the shot was fired showed that some one had eaten a lunch there.    Just after the report of the rifle Redman saw a man, about the size of the accused, running in the woods about forty yards from the bluff.

Accused looked at a gun Charley Hayburn had for sale, about two weeks before Redman was shot.    On the day before the shooting he purchased the gun and about thirty steel jacketed cartridges.    He came to Hayburn's place about dark and had him bring the gun out to the road, and after he bought the gun he asked Hayburn to "say nothing about it."

Accused was seen by Amos Jones about 3.30 o'clock in the afternoon of the day of the shooting crossing a hollow in the woods about three-quarters of a mile from Redman's house, and across the ridge from the house. He motioned Jones to come to him.    When he approached him, accused had a high power gun under his arm and a pistol in his pocket and said he took Jones to be his friend and asked Jones if he knew that Redman was shot.    He told Jones he had not had any water all day and was very thirsty and requested Jones to get John Blakemore's car to come after him and to tell

36

Blakemore he could find him in a certain nearby corn field.    Accused told Jones he would rather not go home for a few days as it would be "suspicioned on him" that he killed Redman, and stated that he was going to Middleboro, Ky., for three or four days.    Jones delivered the message to John Blakemore at Pennington Gap and the car left at once.    Blakemore returned with a man in the car, arriving at Pennington Gap just after the train had passed.

Deputy Sheriff Stacy, upon receiving information of the shooting and the probable whereabouts of the accused, left for Pennington Gap.    On the way, after daylight, they saw two men standing by the roadside whom they took to be John Blakemore and the accused, and when he and those with him came within fifteen steps of the car they heard voices which they took to be the voices of Blakemore and the accused.    The two men entered the car and drove towards Pennington Gap. The deputy and his assistants went to Pennington Gap. Not finding the accused there they went by Dry Branch, then to Black Mountain, and later to Rose Hill.    They arrested John Blakemore, Ves Cottrell's son, Tom Cornette and Bill Barker about 3.00 a. m. the next day at Pennington Gap and examined a car in the possession of Cornette and Barker and found it wet and muddy with clay mud, noticing at the same time the tread of the car.    On the way to Rose Hill, they traced the track of the same kind of tread up to a hillside near Rose Hill, where it was evident the car got stuck in the red mud and turned and came back.    They saw a place where it looked like one man had gotten out of the car and walked on toward Rose Hill.

The accused was seen by Chas. Crockett in Rose Hill early in the morning of the day after the shooting.    He purchased a shirt and tie from N. M. Rowlett and put

them on before leaving the store, and soon thereafter was arrested, just before the train, which would have taken him out of the State, passed Rose Hill. When arrested he stated that he was in Middleboro, Ky., the day Redman was shot.

Accused told Amos Jones that Alex Ely, one of the assistants of the deputy sheriff, while hunting for the accused, walked up and took a seat on a fence in fifteen feet of him and sat there about an hour, and that if Ely had turned his head he would have killed him.

Redman, previous to the shooting, had arrested the accused for being drunk, having whiskey in his possession and for shooting up the town of Pennington Gap. About a month before Redman was shot accused told Robert Harris there was "a fellow we had to get rid of," and, upon being asked who it was, the accused said it was Charles H. Redman, and added that there was $300.00 for the man who would kill him; that "the guns had been appropriated for the business;" and that one of the guns was a thirty-eight special and the other a high power gun. The accused also told Harris that "a man could go on the hill at St. Charles and do it off the hill," the hill referred to being the one from which Redman was afterwards shot. During the conversation Carl Helan came up and the accused asked him about committing the crime, and Helan said he had gotten out of the notion. Accused stated to Harris that Jack Catron and Carl Helan intended to kill Redman but had backed out. Accused then offered Harris and Carl Helan $300.00 if they would kill him and advised them to go up in the bushes in front of Redman's house. Three weeks before the shooting the accused offered Carl Helan and Jack Catron $500.00 to kill Redman and gave them the guns, which the accused had sent to Matt Helan's house, one being a high power and

the other a thirty-eight special. They started down the railroad track to commit the crime. After going about a half mile they met Matt Helan and told him what they were about to do, and, upon his advice, turned and went back. Accused told Jack Catron there was a good place on the right hand side of the road at St. Charles, that there were some bushes and a hollow there, and that Catron could commit the crime from the hollow, or from the cliff opposite Redman's house, from which Redman was afterwards shot. Accused told Matt Helan that he intended to kill Redman.

The foregoing are among the material facts and circumstances appearing from the evidence introduced on behalf of the Commonwealth.

The accused based his defense upon an alibi and introduced witnesses who testified that he was in Middleboro, Kentucky, the day of the shooting. Other witnesses were sworn for the purpose of impeaching the witnesses for the Commonwealth. Upon the conflicting evidence thus presented the jury found the accused guilty. There was evidence to support their verdict and under familiar principles we are not authorized to disturb it.

We find no error in the judgment complained of and it will be affirmed.

*Affirmed.*