**Alexandria**
LINDA FAY CIRIOS
v.
COMMONWEALTH OF VIRGINIA
No. 1340-86-4
Decided October 18, 1988

COUNSEL

Albert J. Ahern, Jr. for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

DUFF, J., — Linda Fay Cirios was convicted by a jury of first degree murder as an accessory before the fact in the killing of her estranged husband. On appeal, she raises four issues: (1) whether the trial judge erred when he refused to grant defendant's motion to strike the evidence; (2) whether the trial judge erred when he reversed his prior ruling and admitted into evidence alleged prejudicial hearsay declarations of David Stebar to his wife; (3) whether the trial judge further erred when he failed to grant limiting instruction T and substitute T as requested by the defendant; and (4) whether the trial judge erred when he refused various instructions tendered on behalf of the defendant. Based upon our review of the record, and the argument and authorities presented, we affirm Cirios' conviction.

When viewed in the light most favorable to the Commonwealth, the evidence revealed the following: Linda Cirios, appellant, filed for divorce from her husband, John Cirios, in April 1985. She then moved from the couple's residence in Bowie, Maryland to New Castle, Virginia, where she lived with James Ring, Sr. (defendant in a companion case) and his son, James Ring, Jr.

On December 9, 1985, while deer hunting, Jamie Phillips found the body of John Cirios at the intersection of Routes 659 and 642 in Loudoun County. The body was found approximately ten to twelve miles by road from where the decedent worked at Alban Tractor in Loudoun County. Cirios was dressed in his Alban Tractor uniform and an Alban Tractor manual was found near his body. He died from multiple gunshot wounds to the chest. The evidence indicated Cirios had been dead for not more than five

days.

John Cirios was last seen alive by three Alban Tractor employees who testified that they saw Cirios at the Alban Tractor plant between 4:00 and 6:00 p.m. on December 4, 1985. Terry Fenton, an employee, testified that he saw Cirios' truck in the parking lot at 2:30 a.m. on December 5, and again at 9:30 a.m. George McKinney, a manager at Alban, testified that he arrived at work at approximately 6 a.m. on December 5, 1985, and that Cirios' pickup truck was in the lot. McKinney found this unusual because Cirios, who was always punctual, did not arrive at work until 8-8:30 a.m. McKinney also noticed frost covering the windows of the truck. Shortly thereafter, McKinney received a phone call from the babysitter of Cirios' daughter. She said that Cirios had not picked up his child the previous evening. The babysitter was upset because Cirios always called if he was going to be late. Sometime between 7:30 and 8 a.m. that morning, McKinney reported Cirios missing.

■ The defendant first challenges the sufficiency of the evidence, alleging that the trial judge erred in refusing to grant her motion to strike the evidence. "Where the sufficiency of the evidence is challenged on appeal, that evidence must be construed in the light most favorable to the Commonwealth, giving it all reasonable inferences fairly deducible therefrom." *Norman v. Commonwealth*, 2 Va. App. 518, 520, 346 S.E.2d 44, 45 (1986) (citing ·*Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)). "In so doing, we must 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.' " *Id.* at 520, 346 S.E.2d at 45 (quoting *Parks v. Commonwealth*, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980), *cert. denied*, 450 U.S. 1029 (1981)).

■ Defendant alleges that none of the evidence connects her to the crime. However, "[c]ircumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the *only* method of proof." *Parks*, 221 Va. at 498, 270 S.E.2d at 759 (citing *Turner v. Commonwealth*, 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977)). The circumstantial evidence relevant to Linda Cirios' involvement in the crime was as follows:

Linda Cheverton, a friend of the defendant and Ring, Sr., testified that the defendant told her: (1) that John Cirios was going to be shot during deer season on his way home from work; (2) that the killing was going to look like a hunting accident; (3) that the killing was necessary so she could get her daughter back and have the money from the decedent's insurance policies; (4) that it was her idea to kill Cirios; that on another occasion she stated she was going to kill him and yet on a different occasion that she was going to get another man to kill him; and (5) that after the killing, Cheverton could move into the decedent's house in Bowie until it was sold and only have to pay the utilities. Cheverton further testified that these conversations took place on several occasions.

Ralph Brown, Jr., who lived at the Ring household in late May or early June of 1985, testified about a conversation he had overheard between the defendant and Ring, Sr. The conversation consisted of Ring, Sr., telling the defendant that he could leave Virginia, kill John Cirios, come back and arrange it so that witnesses would say he had never left.

At trial, the personnel manager at Alban Tractor testified that at the time of Cirios' death, he had insurance policies with his employer having a face value of $260,000. The defendant was the primary beneficiary on all policies, with the exception that the daughter was the beneficiary on the contributory portion.

John Cirios' former attorney testified that the defendant was very angry, loud, and abusive during a meeting in his office to discuss granting temporary custody of the couples' daughter to the husband. He also testified that on August 7, 1985, when temporary custody of the daughter was officially awarded to John Cirios, the defendant was heard screaming in the courtroom and had to be gaveled to order by the judge.

Ginger Harrison testified that she was at the Ring home on November 25, 1985, and that she overheard the defendant say to Ring, Jr.: "[J]immy, you know we don't need a lot of people around here because of the things that are going on."

Carol Mintz, a former neighbor in Maryland, testified that the defendant called her on the telephone a few weeks after she moved to New Castle. The defendant solicited Mintz' help in locating John Cirios and her daughter. During the conversation, the

defendant became very upset and told Mintz: "[T]ell that son of a bitch I am going to blow his f——— head off." Mintz testified that on December 3, 1985, John Cirios told her that he was going to meet with Linda Cirios the next day. On December 5, 1985, Linda Cirios told Mintz that she had never met Cirios because of car trouble. The defendant told Officer Jaskot of the Loudoun County Sheriff's Department that she called Cirios at Alban Tractor at approximately 4:30 p.m. and spoke with him until approximately 5:15 p.m.

Derick Rock testified that he lent Stebar (defendant in a companion case) a .22 caliber revolver. Stebar had told Rock that he "wanted a quieter gun, one which wouldn't make much noise." Stebar's former wife testified that on October 27, 1985, she and Stebar went target practicing on Potts Mountain, near New Castle, with the revolver he had borrowed from Rock.

Five .22 caliber bullets were removed from Cirios' body at the autopsy. Julian Mason, a forensic scientist in the field of firearms, testified that these bullets could have been fired from the revolver that Rock lent Stebar. He testified that they had the same general characteristics and that it is not unusual when dealing with .22 caliber firearms and bullets to be unable to positively determine whether a bullet was fired from a particular firearm. He explained that the bullets do not pick up good microscopic markings suitable for identification, and that when they do pick up these markings, they are very easily wiped off when the bullet comes in contact with some object.

Accounting for his whereabouts on December 4, 1985, Stebar told Deputy Gibson that he was with Ring, Sr. in Roanoke in the morning. He stated that they had gone to various places, including two bars, Bernie's and Snuggeries, and then went to the Pizza Hut in Salem between 5 and 6 p.m. Stebar said Ring, Sr. called home to New Castle from the Pizza Hut. Stebar stated that they both arrived at the Ring residence in New Castle at approximately 10 p.m. for about fifteen minutes when they left to "spotlight" deer. They returned after midnight.

Gail Jones, a friend of Ring, Jr. testified that she was at the Pizza Hut in Salem on December 4 with Ring, Jr. She testified that Ring, Jr. had left the table to use the telephone, and that she had not seen Ring, Sr. or Stebar at the Pizza Hut that evening.

Wayne Wilson, a resident of the Ring household on December 4, 1985, testified that the last time he saw Ring, Sr. or Stebar on that day was at 9 a.m. They were in Ring, Sr.'s silver pickup truck. Wilson said he returned home at 1 p.m., and again at 9:15 or 10:30 p.m., and never saw Ring or Stebar. He did see them the morning of December 5, 1985.

Leonard Warner testified that on December 4, 1985, while driving by the intersection of Routes 642 and 649 in northern Virginia, he saw a white or light colored pickup truck near where Cirios' body was later found. He saw the truck at 1 p.m. and again at 5:30 p.m.

Bruce Evers, an employee of the C&P Telephone Company in Virginia, testified that between 7:22 p.m. and 11:50 p.m. on December 4, eight incomplete calls were made from the home of Ring, Sr. to the home of the decedent.

 In construing the evidence in the light most favorable to the Commonwealth, we find that the trial judge did not err when he denied the defendant's motion to strike. In *McGhee v. Commonwealth*, 221 Va. 422, 270 S.E.2d 729 (1980), the court held that to prove guilt as an accessory before the fact "[t]he evidence must . . . establish that the accessory before the fact shared the criminal intent of the principal. . . .[T]he accused must either know or have reason to know of the principal's criminal intention and must intend to encourage, incite or aid the principal's commission of the crime. The amount of incitement or encouragement to commit the crime is *irrelevant if the encouragement in fact induces the principal to commit the offense.*" *Id.* at 427, 270 S.E.2d at 732-33 (emphasis added). "[I]n the trial of an accessory before the fact, the Commonwealth [must] establish . . . beyond a reasonable doubt: the commission of the crime by the principal, the accessory's absence at the commission of the offense, and that before the commission of the crime the accessory was 'in some way . . . [a] contriver, instigator or advisor.' " *Id.* at 425-26, 270 S.E.2d at 731. *McGhee* held that the conviction could be based upon circumstantial evidence, as well as direct evidence. *Id.* at 427, 270 S.E.2d at 733. While no single piece of evidence, standing alone, ties the accused directly to the killing, we find that the totality of the evidence supports the trial judge's decision to deny the motion to strike the evidence. We further find that the evidence was sufficient to support the jury's finding that Linda Cirios

was an accessory before the fact of first degree murder.

Defendant alleges as her second issue that the trial judge erred by admitting into evidence prejudicial hearsay declarations of Stebar to his wife. We disagree.

At trial, the defendant objected to the statements of Karen Goodman, the former wife of Stebar, on the basis that the testimony would violate the marital privilege that was in effect at the time, and on the ground that proof of Stebar's participation in the conspiracy was insufficient to permit the use of a statement by him against the defendant. The court overruled the objection based on marital privilege because the spouse, Stebar, was not on trial. The trial judge sustained the objection based on insufficient proof of Stebar's participation in the conspiracy. The court stated that the evidence might be admissible later if a *prima facie* case of conspiracy involving Stebar was proved. The following day after additional testimony and argument on the point, the court held that a *prima facie* case of conspiracy involving Stebar had been established.

Thereupon Stebar's former wife testified that during her marriage and around mid-October 1985, he had told her that he and Ring, Sr. had private business in Maryland, and not to worry if he was gone a few days. He also told her that the result of the business would enable them to pay off over $31,000 in debts which they owed. The defendant moved the court for a cautionary jury instruction regarding this testimony. The court denied the motion.

Conspiracy is defined as "an agreement between two or more persons by some concerted action to commit an offense." *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937). The offense "is committed when the agreement is complete regardless of whether any overt act in furtherance of the commission of the substantive offense is initiated." *Ramsey v. Commonwealth*, 2 Va. App. 265, 270, 343 S.E.2d 465, 469 (1986). The admissions made by a co-conspirator is a well known exception to the hearsay rule in Virginia. We observed in *Amato v. Commonwealth*, that " 'the acts and declarations of any of the conspirators, in furtherance of the object of the conspiracy, are admissible against each and all of them, though such acts and declarations were not done and said in the presence of all.' " 3 Va. App. 544, 552, 352 S.E.2d 4, 8-9 (1987) (quoting *Sands v. Com-*

*monwealth*, 62 Va. (21 Gratt) 871, 897 (1872)). C. Friend, *Law of Evidence in Virginia*, § 259 (2d ed. 1983) states: "The co-conspirator rule applies in civil as well as criminal trials. The criminal trial need not be on a charge of conspiracy; it is sufficient that the crime charged was committed pursuant to the conspiracy." *See Cottrell v. Commonwealth*, 134 Va. 554, 113 S.E. 728 (1922). In *Floyd v. Commonwealth*, 219 Va. 575, 581-82, 249 S.E.2d 171, 175 (1978), the court stated "The general rule is that there must be evidence establishing a prima facie case of conspiracy before the declarations of a co-conspirator, made out of the defendant's presence, may be admitted into evidence." *Prima facie* evidence was defined in *Babbit v. Miller*, 192 Va. 372, 379, 64 S.E.2d 718, 722 (1951) as "evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted." "The order of presentation of evidence, however, is usually a matter left to the discretion of the trial court and, absent an abuse of discretion, will not be disturbed." *Floyd*, 219 Va. 582, 249 S.E.2d at 175. In the case at bar, the trial judge heard extensive arguments from both attorneys prior to determining that the facts established a prima facie case of conspiracy. We agree with his finding.

The defendant next argues that it was error for the trial judge to refuse to grant Instruction T[1] or Substitute T[2], because the question of whether a prima facie case of conspiracy had been proven was a question for the jury and not for the judge. The instructions told the jury that they must first determine if a con-

---

[1] INSTRUCTION T - The jury is instructed that the court received in evidence certain statements allegedly made by the defendant Stebar to his wife outside the presence of the defendant Linda Cirios. You are instructed that you may not consider these statements made by Stebar to his wife against the defendant Linda Cirios unless you find from the evidence that at the time they were made, there was a conspiracy between the defendant Linda Cirios and David Stebar. If you do not so find, you should disregard said statements, since those statements would only be admissible against David Stebar, who is not on trial.

[2] SUBSTITUTE INSTRUCTION T - The jury is instructed that the Court received in evidence certain statements allegedly made by the defendant Stebar to his wife outside the presence of the defendant Linda Cirios. You are instructed that you may not consider these statements against Linda Cirios unless you find at the time they were made she and Stebar were conspiring or acting in concert to kill Mr. Cirios. If you do not so find, you should disregard said statements since they would only be admissible vs. David Stebar who is not on trial. Despite the legal theory under which they were admitted the defendant is not being tried for conspiracy to murder which is a separate offense from the substantive charge of first degree murder for which the defendant is on trial.

spiracy had been proven before they could consider Stebar's statements. We find that the instructions were correctly excluded. In *United States v. Scott*, 730 F.2d 143 (4th Cir.), *cert. denied*, 469 U.S. 1075 (1984) the court stated:

> [B]efore the court allows into evidence statements made by one defendant against another under the co-conspirator exception, it must find "the existence of and the [defendant's] participation in the conspiracy" by a fair preponderance of independent evidence. Fed. R. Evid. 104; *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 320 (4th Cir. 1982). Consequently, the co-conspirator rule has evolved into a two pronged procedure: first, the trial judge, as a matter of law, determines the admissibility of the statements according to the independent evidence test and, second, the jury then determines the credibility to be accorded any statements previously admitted under such rule.

*Id.* at 148.

*Scott* also held that the judge's ruling on the existence of a conspiracy "need not be explicit." *Id.* "Submission of the case to the jury, with instructions that it can consider co-conspirator statements, is an indication that the court has found independent evidence establishing a prima facie case [of a conspiracy]." *Id.* at 148-49. In conclusion, we find that the trial judge correctly excluded the limiting instructions because they were contrary to law.

Our final concern is the defendant's contention that the trial judge committed reversible error when he refused instructions G[3],

---

[3] INSTRUCTION G - The jury is instructed that before you can convict the defendant as an accessory before the fact, you must believe beyond a reasonable doubt that the defendant participated in the venture so as to attribute to her an actual desire to bring about the killing of her spouse. You are further instructed that with respect to the statements attributed to the defendant concerning her desire to have her husband killed, assuming you believe those statements were made, before you could hold those statements to the level of instigation, contriving or advising in the homicide of her husband, you would have to be satisfied beyond a reasonable doubt that her alleged statements were the causal connection which brought about the crime in question. If you have a reasonable doubt about this, you must give the defendant the benefit of the doubt and find her not guilty.

## H[4], I,[5] Q[6], S[7], and U[8].

[4] INSTRUCTION H - The jury is instructed that in order for the Commonwealth to convict the defendant as an accessory before the fact, it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

[5] INSTRUCTION I - The jury is instructed that even if you believe beyond a reasonable doubt that the substantive charge of murder was committed by the principals David Stebar and James Ring, Sr., you could not convict the defendant Linda Cirios as an accessory before the fact unless you believed beyond a reasonable doubt from the evidence introduced that the defendant Linda Cirios was not only the "contriver, instigator, or advisor" of the crime in question, but that the evidence showed beyond a reasonable doubt, that she, as an accessory before the fact, shared the criminal intent of the principal. If you have a reasonable doubt about this, you would have to give the benefit of the doubt to the defendant and find her not guilty.

[6] INSTRUCTION Q - The jury is instructed that the mere fact that a person with knowledge that another intends to commit a crime acquiesces in its commission will not, provided that he does nothing to procure or bring about the commission of the crime, render him an accessory before the fact.

[7] INSTRUCTION S - When two or more persons knowingly associate themselves together to carry out a common plan or arrangement, with the intent either to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means, there arises from the very act of knowingly associating themselves together with such itnent, a kind of partnership in which each member becomes the agent of every other member.

So, where the evidence in the case shows such a common plan or arrangement, evidence as to an act knowingly done or a statement knowingly made by one such person, while the common plan or arangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all.

In order to establish proof that such a common plan or arrangement existed, the evidence must show that the parties to the plan or arrangmeent in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish some intended object or purpose of the plan or arrangement.

In determining whether or not a defendant, or any other person, was a party to or member of such a common plan or arrangement, the jury are not to consider what others may have said or done. That is to say, the membership of a defendant, or any other person, in such a common plan or arrangement must be established by evidence as to his own conduct — what he himself knowingly said or did.

If and when it appears from the evidence in the case that such a common plan or arrangement did exist, and that a defendant was one of the members of the plan or arrangement, then the acts and statements by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the acts and statements may have occurred in the absence and without the knowledge of the defendant, provided such acts and statements were knowingly done and made during the continuance of the common plan or arrangement, and in furtherance of some intended object or purpose of the plan or arrangement.

Otherwise, any admission or incriminatory statement made or act done by one person, outside of court, may not be considered as evidence against any person who was not present and saw the act done, or heard the statement made.

A statement or an act is "knowingly" made or done, if made or done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

Each of these instructions emphasized and expanded on particular aspects of the elements of the accessory before the fact definition as outlined in instruction 8, which was granted by the court. [9] Instruction G stressed that the statements made by the accused had to be the "causal connection" which brought about the crime. Instruction 8 addressed the same concept, albeit in somewhat different terms, in defining an accessory before the fact as one who in some way planned, advised or assisted in the commission of the crime. Similarly, the concepts presented by instructions H, Q, and U were embraced adequately in instruction 8.

Instruction I, involving the need for the accessory to share the principal's criminal intent, was covered adequately in instructions 8 and 9, which required the jury to find that the principals had committed the crime before it could find the accused guilty as an accessory.

The substance of instruction S had been decided by the court in its denial of instruction T and substitute T relative to the existence of a conspiracy. As indicated earlier, this was a legal issue for the court, not a factual issue for the jury. The trial court had determined the admissibility of the offered statements, and the jury had to determine the credibility of the statements so admitted. The jury was properly instructed as to how to evaluate the credibility of the witnesses.

■ When one instruction correctly states the law, the trial court does not abuse its discretion by refusing multiple instruc-

---

[8] INSTRUCTION U - The jury is instructed that the mere fact that the accused had knowledge of an intended crime on the part of another and concealed the same, or failed to prevent it, will not render an accused an accessory before the fact. Mere approbation of a proposed crime to be committed by another will not render one an accessory before the fact.

[9] The court instructs the jury that an accessory before the fact is one who was not present at the time of the commission of the crime of first-degree murder, but who, before the commission of the crime, in some way planned, advised or asisted in the commission of the crime, knowing or having reason to know of the intent of the principal to commit the crime.

An accessory before the fact is liable for the same punishment as the person who actually committed the crime.

The Commonwealth must prove beyond a reasonable doubt that the defendant is an accessory before the fact. If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the offense, then you shall find the defendant not guilty.

tions upon the same legal principle. *Tuggle v. Commonwealth*, 228 Va. 493, 508, 323 S.E.2d 539, 548 (1984), *vacated on other grounds*, 471 U.S. 1096 (1985). We find no reversible error in the court's denial of the tendered instructions.

For the reasons stated, the conviction appealed from is

*Affirmed.*

Keenan, J., and Moon, J., concurred.