COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Petty and Alston
Argued at Richmond, Virginia


IAIN GAINOV

                                                   MEMORANDUM OPINION* BY
v.        Record No. 1481-08-2        JUDGE ROSSIE D. ALSTON, JR.
                                                     SEPTEMBER 1, 2009
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul M. Peatross, Jr., Judge

Charles L. Weber, Jr., for appellant.

Joanne V. Frye, Assistant Attorney General (William C. Mims,
Attorney General, on brief), for appellee.


Iain Gainov was convicted in a bench trial of felony child neglect, in violation of Code

§ 18.2-371.1.  On appeal, he contends that the trial court erred by permitting expert testimony on

an ultimate issue of fact, and by finding the evidence sufficient to support his conviction.  For the

reasons that follow, we affirm Gainov's conviction.

I.  BACKGROUND

"On appeal, we construe the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom."  Zoretic v. Commonwealth,

13 Va. App. 241, 242, 409 S.E.2d 832, 833 (1991) (citing Higginbotham v. Commonwealth, 216

Va. 349, 352, 218 S.E.2d 534, 537 (1975)).  Viewed by that standard, the evidence demonstrates

that on March 1, 2005, Gainov was caring for his eight-and-a-half-month-old daughter (infant).

At that time, Gainov was a Pediatric Pulmonary fellow at the University of Virginia and was

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

studying for his pediatric board exams.  Colleen Gainov (mother), infant's mother and Gainov's wife, was absent from home attending a dentist appointment.

That afternoon, Gainov called infant's primary care physician, Dr. Heather Quillian. Gainov was concerned because infant was ill, exhibiting symptoms such as increased body tone, grunting noises, drooling, right sided facial tick, and smacking of her lips.  Upon being informed of infant's symptoms, Dr. Quillian ordered Gainov to call 911.  Before calling 911, Gainov attempted to reach both his wife and a neighbor by telephone.  Thereafter, Gainov followed Dr. Quillian's instruction to call 911.  Within fifteen minutes, an ambulance equipped to assist pediatric patients arrived and transported infant to the pediatric emergency room.

Following infant's transportation to the emergency room, infant continued to twitch, smack her lips, her eyes were bouncing, and her breaths were rare and shallow.  Infant's temperature was ninety-three degrees, and she had abrasions on the tip of her nose and the sides of each nostril.  Infant's status was life-threatening.  The emergency rescue personnel and emergency room physician, Dr. Scott Syverud, initially diagnosed infant as having prolonged seizures.  In total, the emergency rescue squad and the emergency room staff administered four anti-seizure medicines to infant—a total of eight to nine doses—to no avail.  Throughout the emergency room staff's treatment of infant, Gainov was by infant's bedside.  During this time, Dr. Syverud explained the treatment and medication infant was receiving, and why the staff felt such steps were necessary.  After some time, Dr. Syverud discussed possible causes of the seizures with Gainov, including low blood sugar, infection, and complications from a previous skull fracture.  After Dr. Syverud mentioned these potential diagnoses, Gainov suggested that infant could have a low sodium condition.  Tests revealed Gainov's diagnosis was correct. Specifically, infant's sodium level was 119 millimoles per liter, well below the normal range of 135 to 145 and low enough to cause hyponatremic seizures.  Infant's seizures subsided after

infant received a dose of saline. Subsequently, infant received more saline intravenously, and her condition improved. Infant's sodium level rose slowly throughout the day and twelve hours after entering the hospital, infant's condition stabilized.

During infant's hospital stay, infant was assessed by Dr. Quillian; Dr. Julie Haizlip and Dr. Noreen Crain, intensive care physicians; and Dr. John Barcia, a pediatric kidney specialist.

On March 3, 2005, Helen Merrick, a social worker and investigator with Albemarle County Child Protective Services (CPS), and Albemarle County Police Detective Terry Walls spoke to Gainov about infant's condition. Gainov told Merrick and Walls that doctors would not find a medical reason for infant's illness. Gainov denied giving infant any water on March 1, 2005.

CPS had previously investigated Gainov for injuries suffered by infant while in Gainov's care. In September 2004, infant suffered third-degree burns when Gainov held a hairdryer to her wet shirt for approximately three minutes. In January 2005, infant suffered a skull fracture when she fell off of a couch after Gainov left her alone while attempting to teach her how to sit. The CPS investigation proved an unfounded case of child abuse against Gainov, and Gainov was permitted to have contact with infant.

Subsequently, Gainov was arrested for child neglect in connection with the events of March 1, 2005. On May 19, 2005, while in police custody, Gainov telephoned mother. During the telephone conversation, Gainov told mother that on March 1, 2005, he flushed out infant's nose four times. He further disclosed that the medical procedure he utilized was normally used for four and five-year-old children, and was not recommended for a child of infant's age. In response, mother asked why Gainov did not disclose the actions previously.

At trial, Dr. Quillian, Dr. Haizlip, Dr. Crain, and Dr. Barcia testified that the cause of infant's hyponatremia was the excess of free water in her system. Free water is plain water

containing no electrolytes. The doctors' testimonies were made independently, based on the totality of the evidence and made to a reasonable degree of medical certainty. Infant had approximately two cups of excess free water in her body.

Dr. Barcia testified that infant's low sodium level and increase in water resulted from infant ingesting the water through her mouth, or resulted from a kidney defect causing infant's body to retain water.

Mother testified that in the past, she saw Gainov irrigate infant's nostrils with water using a blue bulb syringe or a small pink stopper with saline. Dr. Crain testified that the blue bulb syringe method is not recommended for giving infant water. Dr. Crain further testified that at infant's age, water is not a major part of infant's diet and an infant of that age should intake no more than four ounces of water a day. Dr. Crain also stated that administering two cups of free water into infant's diet could alter the electrolyte balance. She further testified that altering the electrolyte balance could cause hyponatremic seizures, a condition difficult to stop. Dr. Crain concluded extended periods of seizure could jeopardize the infant's brain and could be fatal.

Dr. Kent Paul Hymel testified as a child abuse pediatrics specialist. During the examination of Dr. Hymel, the Commonwealth posed a hypothetical. The factual predicate for the hypothetical involved an adult who is present in the emergency room presenting conflicting accounts to the primary care physician regarding the cause of a child's injury. The Commonwealth asked if this hypothetical would be "inconsistent with child abuse." Dr. Hymel responded, "It's not inconsistent. It does happen and it is a red flag, but it doesn't happen in every case."

Helen Merrick testified that she conducted a CPS investigation pertaining to the incidents of March 1, 2005. The Commonwealth posed the following question to Merrick regarding two previous investigations CPS conducted involving infant's injuries while in Gainov's care:

"[A]fter the events of March 1st and your investigation, did you change your opinion about the previous incidents with Dr. Gainov [that you had determined to be] unfounded?" In response, Merrick replied that she did change her opinion. Gainov objected to the testimony, and the trial court sustained the objection.

Gainov was convicted of felony child neglect. This appeal followed.

## II. EXPERT TESTIMONY

On appeal, Gainov contends the trial court abused its discretion by permitting the expert testimony of Dr. Hymel and Helen Merrick on an ultimate issue of fact.[1] We disagree and conclude that the trial court did not abuse its discretion.

### DR. HYMEL'S TESTIMONY

As noted, at trial, the Commonwealth posed a hypothetical to Dr. Hymel involving an adult who is present in the emergency room presenting conflicting accounts to the primary care physician regarding the cause of a child's injury. The Commonwealth asked if this hypothetical would be "inconsistent with child abuse." Dr. Hymel responded, "It's not inconsistent. It does happen and it is a red flag, but it doesn't happen in every case." Gainov contends Dr. Hymel's testimony in this regard was "exceptionally prejudicial and usurped the fact-finder[']s ability to decide whether the trauma alleged . . . was the result of willful child abuse." However, as the Commonwealth points out, Gainov failed to object to Dr. Hymel's testimony during the trial.

---

[1]    "[W]hile an expert witness may be permitted to express his opinion relative to the existence or nonexistence of facts not within common knowledge, he cannot give his opinion upon the precise or ultimate fact in issue, which must be left to the jury or the court trying the case without a jury for determination."

Llamera v. Commonwealth, 243 Va. 262, 264, 414 S.E.2d 597, 598 (1992) (quoting Webb v. Commonwealth, 204 Va. 24, 33, 129 S.E.2d 22, 29 (1963)).

Rule 5A:18 provides, in pertinent part, that "no ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."  Pursuant to Rule 5A:18, we "will not consider an argument on appeal [that] was not presented to the trial court."  Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).

> Under this rule, a specific argument must be made to the trial court at the appropriate time, or the allegation of error will not be considered on appeal.  A general argument or an abstract reference to the law is not sufficient to preserve an issue.  Making one specific argument on an issue does not preserve a separate legal point on the same issue for review.

Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (en banc) (citations omitted).  The main purpose of this rule is to ensure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals and reversals.  See Lee v. Lee, 12 Va. App. 512, 514, 404 S.E.2d 736, 737 (1991) (en banc).

In this case, Gainov failed to object to the line of questioning regarding the hypothetical posed and Dr. Hymel's response.  It is clear, therefore, that, despite having had the opportunity to do so, Gainov did not raise below, and the trial court was not given the opportunity to address, the claim Gainov now raises on appeal.  We hold, therefore, that, Gainov is procedurally barred by Rule 5A:18 from raising the issue for the first time on appeal.  Moreover, our review of the record in this case does not reveal any reason to invoke the "good cause" or "ends of justice" exceptions to Rule 5A:18.  See M. Morgan Cherry & Assocs. v. Cherry, 38 Va. App. 693, 701-02, 568 S.E.2d 391, 395-96 (2002) (en banc); Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997).

At trial, the Commonwealth posed the following question to Helen Merrick: "[A]fter the events of March 1st and your investigation, did you change your opinion about the previous incidents with Dr. Gainov [that you had determined to be] unfounded?" In response, Merrick replied that she did change her opinion. Gainov objected, and the trial court sustained the objection.

On appeal, Gainov contends the Commonwealth's question and Merrick's response constituted testimony on the ultimate issue of fact in this case, that is, whether Gainov committed child neglect. Under the circumstances, we presume the trial judge followed his own ruling in sustaining Gainov's objection, and disregarded Merrick's testimony on this matter. "A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both." Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). Consequently, "we presume that a trial judge disregards prejudicial or inadmissible evidence." Cole v. Commonwealth, 16 Va. App. 113, 116, 428 S.E.2d 303, 305 (1993). Thus, we conclude the trial court did not abuse its discretion in this regard.

## III. SUFFICIENCY OF THE EVIDENCE

Gainov further contends the evidence was insufficient to support his conviction. He claims the evidence did not show he committed a "willful" act, a finding required to support a

felony child neglect conviction under Code § 18.2-371.1.[2]  We disagree and find that the evidence was sufficient to convict Gainov of the charge.

"When ruling upon the sufficiency of the evidence, we grant the judgment of a trial court sitting without a jury the same weight as a jury verdict and will not disturb that judgment on appeal unless it is plainly wrong or without evidence to support it."  Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999).  "'In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'"  Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998) (quoting Cirios v. Commonwealth, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988)).  "'Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from [proven] facts [that] are within the province of the trier of fact.'"  Ellis, 29 Va. App. at 555, 513 S.E.2d at 456 (quoting Fleming v. Commonwealth, 13 Va. App. 349, 353, 412 S.E.2d 180, 183 (1991)).

"The statutory requirement that such conduct be 'willful' means that the conduct must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose."  Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004).  Thus, the term 'willful,' as used in Code § 18.2-371.1(A), contemplates "'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'"  Ellis, 29 Va. App. at 554, 513 S.E.2d at 456 (quoting Snead v.

---

[2] Code § 18.2-371.1 provides, in relevant part, as follows:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act . . . permits serious injury to the life or health of such child shall be guilty of a Class 4 felony.

Commonwealth, 11 Va. App. 643, 646, 400 S.E.2d 806, 807 (1991)). "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality." Id. (citing United States v. Murdock, 290 U.S. 389, 395-96 (1933)).

In this case, the evidence is sufficient to support Gainov's conviction. The evidence at trial indicated CPS conducted two previous investigations of injuries suffered by infant while in Gainov's care. The evidence also showed that on March 1, 2005, upon arriving at the emergency room, doctors improperly diagnosed infant in treating her for seizures. Gainov, who was receiving training in pediatric medicine, was present during the administration of anti-seizure medication that did not ameliorate infant's condition. In fact, Dr. Syverud explained to Gainov what the staff was doing, and the rationale behind their decisions. Only after Dr. Syverud discussed a number of erroneous potential causes of infant's infliction did Gainov suggest that infant might be suffering from low sodium. Gainov's diagnosis was correct. Infant had two cups of excess free water in her body and was diagnosed with hyponatremia. Gainov did not report to the doctors evaluating infant, or to Detective Walls and Helen Merrick who were investigating the incident, that he gave infant free water through irrigation of her nose. Gainov said nothing about the procedure he used until May 19, 2005, when he called mother from jail and disclosed to her that he irrigated infant's nose three to four times on March 1, and did it before each feeding. Gainov further told mother the procedure he used was not recommended for a child of infant's age. He also stated that the procedure is recommended for four and five-year-old children.

Under these facts and circumstances, the trial court could determine that Gainov, who had specialized medical training in pediatrics, acted in a willful manner with full knowledge of the consequences of his actions. Not only did he cause infant's affliction, he did not timely offer

information that may have sped her recovery.  Thus, the trial court could find that Gainov acted with a "bad purpose" or "without justifiable excuse," because he knew his conduct would result in injury to infant.  See Ellis, 29 Va. App. at 554, 513 S.E.2d at 456.  We conclude, therefore, the evidence was sufficient to support Gainov's conviction.

## IV.  CONCLUSION

For these reasons, we affirm Gainov's conviction.

Affirmed.